UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
ARTHUR L. LLOYD,                        )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      Civil Action No. 97-1287 (PLF)
                                        )
MICHAEL B. MUKASEY,                     )
United States Attorney General,[1]      )
                                        )
            Defendant.                  )
_____)


OPINION

        This matter is before the Court on plaintiff's motion to set aside the settlement

agreement.[2]  For the reasons explained below, the Court declines to approve the settlement

_____

        [1]      Under Rule 25(d)(1) of the Federal Rules of Civil Procedure, Attorney General
Mukasey has been substituted for former Attorney General Gonzales.

        [2]      The papers that have been submitted to the Court in connection with this motion
include, but are not limited to: plaintiff's motion to set aside the settlement agreement ("Mot.");
defendant's memorandum of points and authorities in opposition to plaintiff's memorandum of
law in support of his motion to set aside settlement agreement ("Opp."); plaintiff's reply
memorandum of law in further support of his motion to set aside settlement agreement ("Rep");
defendant's memorandum in response to the Court's question on its duty regarding the settlement
agreement ("Def.'s Mem."); plaintiff's memorandum in response to the Court's question on its
duty regarding the settlement agreement ("Pl.'s Mem."); the submission of attorney David W.
Sanford ("Sanford Mem."); plaintiff's proposed findings of fact and conclusions of law ("Pl.'s
Prop."); and defendant's proposed findings of fact and conclusions of law ("Def.'s Prop.").
Particularly with respect to the Court's findings of fact, and where appropriate, the Court has
borrowed without citation from the parties' helpful proposed findings.

        The Court held an evidentiary hearing on four days: (1) on January 11, 2008,
when Mr. Lloyd testified, (2) on February 22, 2008, when Veronice Holt testified, (3) on March
20, 2008, when David Sanford testified, and (4) on May 23, 2008, when Oliver McDaniel and
Joe Lazar testified.  Citations to the transcript of the hearing in this matter are designated "Hr'g
Tr." and indicate the date of the hearing and the page of the transcript.  Exhibits admitted at the

agreement, and therefore will grant plaintiff's motion to set it aside.

## I.  FINDINGS OF FACT

The Court makes the following findings of fact:

Plaintiff Arthur Lloyd was a Deputy United States Marshal employed by the United States Marshals Service, a unit of the Department of Justice, for 24 years, first in the Superior Court of the District of Columbia and then in this Court.  He brought suit in 1997 against the Marshals Service, claiming discrimination based on race and retaliation during the years 1990 through 1994.  On October 26, 2001, after an eight-day trial at which Mr. Lloyd was ably represented by Veronice Holt, the jury found for plaintiff on all six of his claims of race discrimination and retaliation.  The jury awarded Mr. Lloyd a total of $36,000 in compensatory damages.  The Court thereafter considered defendant's motion for judgment as a matter of law, for a new trial and for remittitur.  The Court entered judgment for the defendant on plaintiff's sole discrimination claim (Count II) and on one of his retaliation claims (Count V), leaving judgment in plaintiff's favor on Counts I, III, IV and VI.  The Court ruled that the jury's award of $36,000 in compensatory damages would stand.

Mr. Lloyd then filed a motion for equitable relief in the amount of $316,143.  To support his motion, Mr. Lloyd submitted an expert report from an economist who works as an expert in calculating economic damages in labor-related matters.  (Hr'g Tr. at 8, Feb. 22, 2008).  Defendant filed an opposition to the motion, arguing that Mr. Lloyd was not entitled to any equitable relief and disputing plaintiff's calculations.  Defendant also submitted a competing

_____

hearing are identified by party and exhibit number, *e.g.* "Pl's Ex. 1," "Def.'s Ex. 1."

expert report.  (Hr'g Tr. at 67, May 23, 2008; Dkt. 147).  Mr. Lloyd testified that at the time he

filed the motion for equitable relief he was anxious to settle this case as soon as possible so that

he could retire.  (Hr'g Tr. at 13, Jan. 11, 2008).  A co-worker had advised him that "once you win

a discrimination suit, it's best to leave the service."  (*Id.*).  Another inspector told him he had

better go because headquarters people were still mad at him.  (*Id.*).  Mr. Lloyd wanted to resolve

his equitable relief before retiring.  (*Id.*).

At a status conference in July 2004, the parties agreed to meet and attempt to

resolve the issue of equitable relief.  (Hr'g Tr. at 11, Feb. 22, 2008; Def.'s Ex. 34 at 19).  In the

fall of 2004, at the Court's request, an effort was undertaken by Magistrate Judge Alan Kay to

settle the remaining issues in the case.  The two primary issues that remained to be resolved were

Mr. Lloyd's claims for equitable relief and attorneys' fees.  (Hr'g Tr. at 20, May 23, 2008).  The

government understandably wanted to resolve the questions of equitable relief and attorneys' fees

simultaneously.  Defendant indicated that it would make an initial offer and would expect to

receive a counteroffer from Mr. Lloyd.  (Hr'g Tr. at 11, Feb. 22, 2008).  Ms. Holt testified that

defendant "was clear about the fact that this was not going to be a take it or drop dead offer. This

was just going to be the opening offer."  (*Id.*).

On October 8, 2004, defendant tendered a written settlement offer through

Assistant United States Attorney Oliver McDaniel pursuant to which Mr. Lloyd would receive

$30,000 in addition to the jury's award of $36,000 in compensatory damages.  (Def.'s Ex. 4).

Defendant's offer described the $30,000 as a "retirement buyout," (*Id.*), but the $30,000 also was

conditional on Mr. Lloyd withdrawing his $316,000 claim for equitable relief.  (Def.'s Ex. 4;

Hr'g Tr. at 22, May 23, 2008).  Mr. Lloyd understood the $30,000 to be payment in settlement of

his equitable relief/economic damages in the case.  (Hr'g Tr. at 28, Jan. 11, 2008).  That was Ms.

Holt's understanding as well.  (Hr'g Tr. at 12-14, Feb. 22, 2008).  While defendant's legal

position was that Mr. Lloyd's equitable relief claim lacked merit, Mr. McDaniel testified that

defendant did not believe its position was a certainty.  (Hr'g Tr. at 8, 22, May 23, 2008).

Defendant's settlement offer included an offer of $120,000 for attorneys' fees.  (Def.'s Ex. 4).

According to Mr. McDaniel, it is the government's policy to negotiate and try to resolve all

outstanding claims, including attorneys' fees, before finally settling a case.  (Hr'g Tr. at 24, May

23, 2008).

Ms. Holt drafted a counteroffer and presented it to Mr. Lloyd for his review.

(Hr'g Tr. at 15, Feb. 22, 2008).  The draft counteroffer was never approved by Mr. Lloyd or sent

to defendant.  (*See* Hr'g Tr. at 15-20, Feb. 22, 2008; Pl.'s Ex. 24; Hr'g Tr. at 28, Jan. 11, 2008).

In the same time period, Mr. Lloyd was contemplating becoming a plaintiff in a

separate class action suit against defendant.  (Hr'g Tr. at 26-27, Jan. 11, 2008; Hr'g Tr. at 16,

Feb. 22, 2008).  During the Fall of 2004, attorney David Sanford was investigating a racial

discrimination class action against the United States Marshals Service.  Mr. Sanford met with

Mr. Lloyd in September of 2004, who he viewed "as [a] potential witness[] and/or potential class

representative[]."  (Hr'g Tr. at 89, Mar. 20, 2008).

In October, 2004, after receiving defendant's settlement offer, Mr. Lloyd shared

its terms with Mr. Sanford and sought a second opinion from him.  (Hr'g Tr. at 14-15, Mar. 20,

2008).  Mr. Sanford agreed to review the case file and provide a second opinion.  (*Id.* at 14-15).

On October 25, 2004, Mr. Sanford called Ms. Holt to inquire about the settlement and to inform

her that he had agreed to review the relevant documentation.  (*Id.* at 24-25, 93).  Ms. Holt

4

informed Mr. Sanford that she was acting as counsel for Mr. Lloyd with respect to the motion

and was not interested in working with him on the case. (*Id.*). She did not send him any

documentation. (Hr'g Tr. at 32-33, Mar. 20, 2008; Hr'g Tr. at 107-09, Feb. 22, 2008).

On Thursday, October 28, 2004, Mr. Lloyd shot and killed a man in Rockville,

Maryland. (Hr'g Tr. at 16, Mar. 20, 2008; Hr'g Tr. at 25-26, May 23, 2008; Dkt. 180 at 3). This

incident received extensive media coverage. (Hr'g Tr. at 28, Jan. 11, 2008; Hr'g Tr. at 20-21,

Feb. 22, 2008; Hr'g Tr. at 26, May 23, 2008). On Saturday, October 30, 2004, Mr. Lloyd met

with Mr. Sanford at his office. (Hr'g Tr. at 16, Mar. 20, 2008; *see also* Hr'g Tr. at 35, Jan. 11,

2008). Mr. Lloyd testified that he was concerned that he would be arrested shortly. (Hr'g Tr.

at 29, Jan. 11, 2008). Mr. Sanford informed Mr. Lloyd that he did not specialize in criminal law

but that he would assist Mr. Lloyd in obtaining a criminal defense lawyer. (*Id.* at 16-17). Mr.

Sanford warned Mr. Lloyd that defense counsel might cost between $75,000 and $100,000.

(Hr'g Tr. at 31, Jan. 11, 2008). Mr. Sanford discussed with Mr. Lloyd possible sources of money

to pay a criminal defense lawyer. (Hr'g Tr. at 45, Jan. 11, 2008). He knew from his earlier

discussions with Mr. Lloyd that he had an outstanding settlement offer of $30,000 plus a $36,000

judgment. (*Id.* at 32). Mr. Sanford suggested that Mr. Lloyd accept the government's offer and

use that money towards his criminal defense. (*Id.* at 34).

At some point between Saturday, October 30, 2004 and Monday, November 1,

2004, Mr. Sanford and Mr. Lloyd together called Ms. Holt from Mr. Sanford's office to inform

her that Mr. Lloyd wanted to accept the defendant's pending settlement offer. (Hr'g Tr. at 35,

Jan. 11, 2008;  Hr'g Tr. at 16-17, 26-27, Mar. 20, 2008). Mr. Lloyd and Ms. Holt both testified

that she agreed to call Mr. McDaniel and attempt to accept the offer of settlement of Mr. Lloyd's

claims for the total of $66,000.  (Hr'g Tr. at 36, Jan. 11, 2008; Hr'g Tr. at 23, Feb. 22, 2008).

That same day, Ms. Holt tried to call Mr. McDaniel to inform him of Mr. Lloyd's decision, but

did not reach him.  (Hr'g Tr. at 24, Feb. 22, 2008).  Ms. Holt left a message requesting that Mr.

McDaniel call her back.  (*Id.* at 23-24, 27).  Mr. McDaniel testified that he knew that she had

called, but was not clear whether he called her back.  (Hr'g Tr. at 24-25, May 23, 2008).

Ms. Holt testified that when she attempted to call Mr. McDaniel, she did not

intend to accept the offer of $120,000 in attorneys' fees that was made in defendant's October 8

letter.  Her intent was to tell Mr. McDaniel that her client would accept the $30,000 the

government had offered – as well as the $36,000 that the jury had awarded him – in exchange for

abandoning Mr. Lloyd's claim for equitable relief.  (Hr'g Tr. at 133-35, Feb. 22, 2008).  Ms. Holt

hoped defendant would agree to resolve the attorneys' fees issue separately at a later date.  (*Id.*).

Since she did not reach Mr. McDaniel, however, defendant was unaware of the substance of what

she intended to communicate.  (*See* Hr'g Tr. at 24-25, May 23, 2008).

Mr. McDaniel was aware on Monday, November 1 that Mr. Lloyd had been

involved in a shooting.  It was "the talk of the office."  (Hr'g Tr. at 25, May 23, 2008).  Mr.

McDaniel concluded from the press accounts that there was a good probability that Mr. Lloyd

would be charged with a crime.  (*Id.* at 25-26).  Mr. McDaniel conferred with Joe Lazar, counsel

to the Marshals Service, following the October 28 shooting incident.  (*Id.* at 7).  Mr. McDaniel

and Mr. Lazar decided to withdraw the settlement offer because of the shooting incident.  (*Id.*

at 7, 26).  Mr. McDaniel could recall only two or three other instances, out of several hundred in

which he was personally involved, when the government had withdrawn a settlement offer.  (*Id.*

at 28).  He also testified that typically the government's offers, on the defense side of litigation,

6

tend to go up, rather than down.  (*Id.* at 28-29).

On November 1, 2004, at 2:03 p.m., Mr. McDaniel faxed a letter to Ms. Holt withdrawing the October 8 settlement offer.  (Def.'s Ex. 5; Hr'g Tr. at 7, May 23, 2008).  Ms. Holt informed Mr. Sanford that she had been unable to "accept" the offer because defendant had withdrawn it before she could do so.  (Hr'g Tr. at 27, Feb. 22, 2008).[3]

On November 2, 2004, Mr. Lloyd was arrested and charged with first degree murder.  (Dkt. 180 at 3).  He was held without bond.  (Hr'g Tr. at 95, Mar. 20, 2008).  He was held in isolation and put on suicide watch after he started fasting.  (Hr'g Tr. at 38-39, Jan. 11, 2008).  After a week of 24-hour lockdown, he was permitted to leave his cell for one hour a day.  (*Id.*).  Mr. Lloyd testified that he felt isolated, depressed and "very anxious."  (*Id.* at 42, 59).

Mr. Sanford contacted Bernard Grimm, a criminal defense attorney, to see if he would represent Mr. Lloyd.  (Hr'g Tr. at 18, Mar. 20, 2008).  Mr. Grimm wanted an initial payment of $5,000, which Mr. Lloyd's brother provided.  (*Id.*).  But when Mr. Lloyd was unable to raise more money, Mr. Grimm declined the case.  (*Id.* at 18, 20).

Ultimately the decision was made to hire Barry Helfand and Stefanie Roemer to represent Mr. Lloyd.  (Pl.'s Ex. 11).  Ms. Roemer had been married to Mr. Sanford.  (Hr'g Tr. at 77, Mar. 20, 2008).  They had divorced but had reconciled and were living together from 2003 through 2005.  (*Id.* at 78).  Ms. Roemer was Of Counsel to Mr. Sanford's law firm on a contract basis.  (*Id.* at 19).  She had been an Assistant United States Attorney in the District of Columbia.

---

[3]      As defendant points out, *see* Def.'s Prop. at 13, Ms. Holt's intention was to "counteroffer," rather than "accept," in that Ms. Holt was going to reject the term of defendant's October 8 offer that provided for $120,000 in attorneys' fees.  Of course, a counteroffer is a rejection of an offer, *not* an acceptance.

(*Id.* at 21).  Mr. Helfand was a Montgomery County criminal defense attorney.  (*Id.* at 20).  Mr.

Helfand is not associated with Mr. Sanford's law firm.

Mr. Sanford prepared a retainer agreement for Mr. Lloyd to sign.  (Hr'g Tr. at 96,

Mar. 20, 2008).  Mr. Lloyd agreed "to retain counsel Stefanie Roemer of Sanford, Wittels &

Heisler [Mr. Sanford's law firm] and attorney Barry Helfand (collectively "Co-Counsel") . . . to

provide legal services . . ." in his criminal case.  (Pl.'s Ex. 11).  Mr. Sanford signed the retainer

agreement on November 22, 2004.  (Pl.'s Ex. 11; Hr'g Tr. at 96, Mar. 20, 2008).  Mr. Helfand

signed the agreement on December 12, 2004.  (Pl.'s Ex. 11).  Mr. Lloyd and his wife also signed

the retainer agreement, but their signatures are not dated.  (*Id.*).  The retainer agreement obligated

Mr. Lloyd to pay a $100,000 fee for his criminal defense:

> The flat-fee, non-refundable rate for representation before the
> District and Circuit Court in Montgomery County in the above case
> is $100,000.00, which includes expenses.  After expenses are paid,
> which Co-counsel estimates will be approximately $30,000.00, Co-
> counsel will split evenly the balance of the $100,000.00.  David
> Sanford's service will be offered pro bono – which means that Mr.
> Sanford will not charge Mr. Lloyd and his family for his time spent
> on this matter.  All disbursements will be payable to Sanford,
> Wittels & Heisler and will thereafter be distributed to Co-Counsel.

(*Id.*).

The first $40,000 of the $100,000 was due by January 5, 2005.  The remainder

was to be paid no later than February 15, 2005.  (Pl.'s Ex. 11).  In the retainer agreement, Mr.

Lloyd also agreed to "turn over to Co-Counsel the settlement proceeds from [his civil case] in the

amount of $36,000.00 before Judge Friedman.  This contract will serve as a lien on that

settlement."  (*Id.*).  The payments were to be made to Mr. Sanford's law firm, but were to be held

in an escrow account for the payment of expert witnesses and attorneys' fees to Mr. Helfand and

Ms. Roemer.  (Hr'g Tr. at 44-47, 81-83, Mar. 20, 2008).

Mr. Lloyd was unable to pay any significant amount of the money towards the retainer until January 19, 2005, when he refinanced his Florida retirement home for $35,217.81. (Pl.'s Ex. 12; Hr'g Tr. at 70-72, Jan. 11, 2008; Hr'g Tr. at 109-10, Mar. 20, 2008).  He gave this money to Mr. Sanford's firm to be held in escrow for his criminal defense.  (Hr'g Tr. at 109-10, Mar. 20, 2008).  Mr. Lloyd, through the refinancing of his house and contributions from his family, eventually paid $63,217 to Mr. Sanford's firm, held in escrow.  (Hr'g Tr. at 144-45, Mar. 20, 2008; Sanford Ex. 1).  Out of that money, Ms. Roemer was paid at least $10,000 in fees. (Hr'g Tr. at 40, Mar. 20, 2008; Sanford Ex. 1).

While Mr. Lloyd was in jail awaiting trial in his criminal case, Mr. Sanford visited him a number of times.  (Hr'g Tr. at 39, Mar. 20, 2008).  On November 15, 2004, Mr. Sanford visited Mr. Lloyd in jail.  (*See* Hr'g Tr. at 47-48, Jan. 11, 2008; Pl.'s Ex. 2).  Mr. Sanford drafted a note from Mr. Lloyd to Ms. Holt requesting that she "coordinate all settlement/payment issues regarding my EEOC/Title VII race discrimination lawsuit with my attorney, David Sanford" and that she send to Mr. Lloyd "the paperwork to sign as soon as possible."  (Hr'g Tr. at 46-47, Jan. 11, 2008; Pl.'s Ex. 2).  Mr. Lloyd signed the note.  (Hr'g Tr. at 7, Jan. 11, 2008; Pl.'s Ex. 2).  Mr. Sanford faxed the note to Ms. Holt that same day.  (Hr'g Tr. at 34, Mar. 20, 2008; Pl.'s Ex. 2).

On November 16, 2004, Ms. Holt faxed Mr. Sanford a response indicating that she did not "jointly" represent Mr. Lloyd, that she believed that Mr. Sanford had "interfered in [her] attorney-client relationship with Mr. Lloyd," and that she would not work with Mr. Sanford on this matter.  (Pl.'s Ex. 3).  Around this time, according to both Ms. Holt and Mr. Lloyd, Mr. Lloyd had a phone conversation with Ms. Holt and told her that he wanted her to continue to

represent him.  (Pl.'s Ex. 4; Hr'g Tr. at 29-30, Feb. 22, 2008; Hr'g Tr. at 49-51, Jan. 11, 2008).

Ms. Holt provided him with information about what was happening in the instant case.  (Hr'g Tr.

at 29, Feb. 22, 2008).

On November 19, 2004, Mr. Sanford responded to Ms. Holt's November 16 letter

and wrote that Mr. Lloyd had "asked [him] six weeks [earlier] to take over [his employment

discrimination] case" because he had been "extremely unhappy with [Ms. Holt's] extensive delay

in bringing to conclusion his civil matter against the U.S. Marshal [sic] Service."  (Pl.'s Ex. 5).

Mr. Sanford further wrote that "Arthur [had] requested that [he] ask [Ms. Holt] to coordinate

with [him] the finalization of his civil matter against the USMS by agreeing to accept the

$36,000 judgment and waive his damages portion."  (*Id.*).

On November 22, 2004, Mr. Sanford stated in a letter to Ms. Holt that his

representation of Mr. Lloyd was pro bono: "To be clear:  I do not have a financial interest in

Arthur's criminal matter.  I am working for him pro bono, and will continue to do so."  (Pl.'s Ex.

6).  Mr. Sanford testified that he meant "I personally and my firm."  (Hr'g Tr. at 107-08, Mar. 20,

2008).  Also on November 22, 2004, Mr. Sanford signed the retainer agreement with Mr. Lloyd.

(*Id.* at 107).  The retainer required Mr. Lloyd to pay $100,000 to Mr. Sanford's law firm, with the

money, after expenses, being split evenly between Ms. Roemer and Mr. Helfand.  (Pl.'s Ex. 11;

Hr'g Tr. at 133, Mar. 20, 2008).  The retainer also provided that the entire $36,000 settlement

from Mr. Lloyd's civil case was to be turned over to pay Co-Counsel in the criminal case, Mr.

Helfand and Ms. Roemer.  (Pl.'s Ex. 11).

On November 22, 2004, Mr. Sanford faxed a letter to Ms. Holt attaching a

handwritten note, signed by Mr. Lloyd, that stated:

> As of today, November 21, 2004, I have retained David Sanford as my
> counsel to handle all matters in my civil case against the U.S. Marshal
> [sic] Service.  Please send to Mr. David [sic] all documents associated
> with my case.  I will no longer need your service.  Thank you for all of
> your work to date.

(Pl.'s Ex. 8).  Mr. Sanford then requested that Ms. Holt "forward to [his] office all documents

associated with Mr. Lloyd's civil matter against the U.S. Marshal [sic] Service."  (Pl.'s Ex. 6).

 In a letter to Mr. Lloyd, Ms. Holt expressed surprise that he had retained Mr.

Sanford and seemed to be dismissing her.  (Pl.'s Ex. 4).  Although Ms. Holt's letter is dated

November 18, 2004, it must have been written after November 21, 2004, because it quotes

language from Mr. Lloyd's November 21 note.  (Pl.'s Ex. 4; Pl.'s Ex. 6; Hr'g Tr. at 57, Jan. 11,

2008).  The previous Sunday, November 14, Mr. Lloyd had told Ms. Holt over the phone "that

[he] wanted Everald [Ms. Holt's co-counsel] and [Ms. Holt] to continue to represent [him] in

[his] Title VII case."  (Pl.'s Ex. 4; Hr'g Tr. at 29, Feb. 22, 2008).

 Ms. Holt explained to Mr. Lloyd in her letter that she thought that she "must

remain in the case for the purpose of negotiating [her] legal fees."  (Pl.'s Ex. 4).  Ms. Holt further

stated that if Mr. Sanford wanted to represent Mr. Lloyd in this matter, then he should file a

praecipe with the Court and the Court would allow Ms. Holt to withdraw.  (*Id.*).  Finally, Ms.

Holt informed Mr. Lloyd of an upcoming meeting before Magistrate Judge Alan Kay on

December 6, 2004, to discuss settlement.  (*Id.*).  Mr. Lloyd testified that he understood from Ms.

Holt's letter that she would remain in the case for the purpose of negotiating her fees but that Mr.

Sanford would represent Mr. Lloyd with respect to settlement.  (Hr'g Tr. at 51, Jan. 11, 2008).

 Ms. Holt faxed a letter to Mr. Sanford on November 22, 2004, informing him of

the upcoming meeting with Judge Kay.  (Pl.'s Ex. 9).  She encouraged him to enter an

appearance: "If you intend to represent Mr. Lloyd you must file your praecipe." (*Id.*).  On

December 6, 2004, Magistrate Judge Kay conducted a mediation session in this matter.  Mr.

Sanford did not enter his appearance and did not attend the mediation.  (Hr'g Tr. at 111, Mar. 20,

2008).  Mr. Lloyd was represented by Ms. Holt at that meeting.  (Hr'g Tr. at 32-33, Feb. 22,

2008).  On December 8, 2004, defendant informed Ms. Holt that "because of its confidence in

the merit of its opposition to the motion for equitable relief, [defendant was] not inclined to

extend an offer in resolution of the motion." (Def.'s Ex. 7).  Ms. Holt sent a letter to Mr. Lloyd

on December 9, 2004, explaining defendant's position.  (Pl.'s Ex. 23).  Ms. Holt wrote that "it is

the Marshals' Service [sic] view that they will starve you out.  By that I mean by refusing to

resolve the equitable relief, they will force you to accept the $36,000 as your total relief." (*Id.*).

On December 9, 2004, Mr. Lloyd was indicted for first degree murder by a

Montgomery County grand jury.  (Hr'g Tr. at 64, Jan. 11, 2008).  At a second bond hearing in

January 2005, Mr. Lloyd was again denied bond.  Mr. Helfand represented Mr. Lloyd at the bond

hearing.  (*Id.* at 65-66).  The Marshals Service placed Mr. Lloyd on non-paid status on December

29, 2004.  (Def. Ex. 9).

On January 11, 2005, Mr. Sanford filed a notice of appearance in this matter on

behalf of Mr. Lloyd.  (Def.'s Ex. 12).  A status conference in this case took place on January 14,

2005.  Although Mr. Sanford had not attended the December mediation before Judge Kay, he did

attend the January 14 status conference before this Court.  (Hr'g Tr. at 111-12, Mar. 20, 2008).

At that point, Mr. Lloyd had not yet been able to pay any significant amount of money towards

his criminal retainer agreement.  (Hr'g Tr. at 109-10, Mar. 20, 2008).  The refinancing of Mr.

Lloyd's Florida home for approximately $35,000 was imminent and would be completed on

January 19, 2005.  (Pl.'s Ex. 11; Pl.'s Ex. 12; Hr'g Tr. at 69-71, Jan. 11, 2008; Hr'g Tr. at 109-10, Mar. 20, 2008).

After the January 14, 2005 status conference concluded, Mr. Sanford approached Mr. Lazar and Mr. McDaniel in the hallway outside the courtroom to discuss settlement.  (Hr'g Tr. at 112, Mar. 20, 2008).  According to Mr. Sanford, they reached an agreement in principle in which Mr. Lloyd would abandon his claim to equitable relief, and defendant would immediately pay Mr. Lloyd the $36,000 he had been awarded by the jury.  (Hr'g Tr. at 112-13, Mar. 20, 2008); *see also* Def.'s Ex. 15.  While Mr. McDaniel did not commit to the agreement at that informal meeting, he communicated his intent to accept the terms after obtaining the necessary government approvals.  (Hr'g Tr. at 12-13, May 23, 2008; Def.'s Ex. 16).

Unlike defendant's October 2004 offer and the government's normal practice in resolving cases where attorneys' fees could be awarded, the agreement did not include a provision resolving the issue of attorneys' fees.  (Def.'s Ex. 15; Def.'s Ex. 16; Hr'g Tr. at 44, Feb. 22, 2008; Hr'g Tr. at 16-17, 24, May 23, 2008).  Instead, defendant agreed to negotiate separately with Ms. Holt to resolve the question of attorneys' fees.  (Def.'s Ex. 15; Def.'s Ex. 16).  Mr. McDaniel testified that the agreement was a good deal for the government.  (Hr'g Tr. at 32, May 23, 2008).  In exchange for Mr. Lloyd giving up his claim for equitable relief, all defendant gave up was its right to appeal the $36,000 judgment.  (*Id.* at 33-35).

Mr. Sanford wrote up the terms of the agreement in a letter and faxed it to Mr. McDaniel at 12:19 p.m. on January 14, 2005.  (Def.'s Ex. 15; Hr'g Tr. at 113, Mar. 20, 2008).  A copy was sent to Ms. Holt.  (Def.'s Ex. 15; Hr'g Tr. at 41, Feb. 22, 2008).  Mr. McDaniel accepted Mr. Sanford's terms by letter on January 21, 2005.  (Def.'s Ex. 16).

On January 18, 2005, Mr. Lloyd wrote Mr. Sanford congratulating him for settling the case and asking if he had to agree to drop "the damages," referring to the equitable relief:

> Congratulations, Stephany [sic] told me you were able to get the Marshal [sic] Service to agree to release the jury award of 36,000.00 thousand. [sic] Well I understand we needed the money to pay our expenses. Since I was not there, I don't know if you had to agree to also drop the damages part of the case in order to get them to agree on giving up the $36,000.00. I believe that is what they wanted.

(Pl.'s Ex. 14).

Based on Mr. Sanford's January 14 letter and his own January 21 acceptance, Mr. McDaniel drafted the Stipulation of Settlement ("the Agreement"). (Hr'g Tr. at 35-36, May 23, 2008; Def.'s Ex. 19). The Agreement required that Mr. Lloyd forever withdraw and abandon his motion for equitable relief. (Def.'s Ex. 19). Defendant agreed not to appeal the final judgment further, but instead to pay the $36,000 judgment after the Court approved the Agreement. (*Id.*). The Agreement did not resolve the issue of attorneys' fees; those were left for Ms. Holt to negotiate with defendant separately. (Def.'s Ex. 19; Hr'g Tr. at 32, May 23, 2008).

The Agreement contains the following provision: "*Upon approval of this settlement agreement by the Court* and notice to counsel, Defendant agrees to initiate processing payment of the thirty-six thousand dollar ($36,000.00) judgment to Mr. Lloyd. Defendant will process the payment to be issued in the form of a wire transfer to Arthur L. Lloyd and to counsel David W. Sanford of Sanford, Wittels & Heisler, LLP." (Pl.'s Ex. 16 ¶ 4) (emphasis provided). The Agreement further provides: "Execution of this Stipulation of Settlement by Plaintiff and his counsel and by the Defendant, and by his representative and counsel, shall constitute final resolution of the merits of this action, *effective upon approval by the Court*, except to the extent

14

that the Court retains jurisdiction of this matter to resolve trial counsel's claim for attorney's fees." (*Id.* ¶ 9) (emphasis provided).

Mr. McDaniel sent the Stipulation of Settlement to Mr. Sanford on January 27, 2005. (Hr'g Tr. at 14, May 23, 2008; Def.'s Ex. 17). Mr. Sanford visited Mr. Lloyd in jail on January 30, 2005 and presented the Agreement to him. (Hr'g Tr. at 75-76, Jan. 11, 2008). Mr. Lloyd testified that Mr. Sanford insisted that Mr. Lloyd sign the Agreement as it was the only way he could get the $36,000 he needed for his criminal case. (*Id.* at 82). Mr. Sanford further told Mr. Lloyd that if he wanted to win his criminal case, he should sign the Agreement or he wouldn't have retained counsel. (*Id.* at 159).

Mr. Lloyd was on suicide watch in solitary confinement and under a great deal of stress at the time of his January 30 meeting with Mr. Sanford. (Hr'g Tr. at 38-39, Jan. 11, 2008). He had been indicted for first degree murder and was denied bond. (Hr'g Tr. at 78, Jan. 11, 2008; Hr'g Tr. at 95, Mar. 20, 2008). His first criminal defense attorney, Mr. Grimm, had declined the case because of lack of funds. (Hr'g Tr. at 78, Jan. 11, 2008; Hr'g Tr. at 18, Mar. 20, 2008). Mr. Lloyd had signed a retainer agreement obligating him to pay $100,000 for his criminal defense, and he had not yet made any significant payment towards that obligation. (Pl.'s Ex. 11; Hr'g Tr. at 109-10, Mar. 20, 2008). Mr. Lloyd testified:

> Well, [defendant] knew I was locked up and they knew I didn't have a choice. There was nothing else I could do. If I wanted a lawyer, as [Mr. Sanford] said, if I want to win this [criminal] case I better sign, because I don't have a lawyer, I don't have anything.

(Hr'g Tr. at 78, Jan. 11, 2008). Mr. Lloyd was reluctant to abandon his equitable relief claim but thought that he had no choice but to do so. (*Id.* at 77, 83). "What I focused on was that this was

the agreement that would give me the $36,000, and at that period of time that's all I was focused on." (*Id.* at 133).

Mr. Lloyd and Mr. Sanford both signed the Settlement Agreement on January 30, 2005. (Def.'s Ex. 19).   One or two days later, Mr. Sanford sent the Agreement back to Mr. McDaniel, who submitted the Agreement to his supervisors for final approval.   (Hr'g Tr. at 15, May 23, 2008).   This procedure allowed Mr. McDaniel's supervisor, Madeline Johnson, and Craig Lawrence, Acting Chief of the Civil Division, to take another look at the Agreement before committing to it.   (*See* Hr'g Tr. at 39-40, May 23, 2008).   Ms. Johnson affixed the United States Attorney's signature on the Agreement with her initials, and then Mr. Lawrence signed the Agreement.   (Def.'s Ex. 19; Hr'g Tr. at 16, May 23, 2008).   Mr. Lazar signed the Agreement on February 1, 2005.   Mr. McDaniel signed the Agreement on February 2, 2005.   (Def.'s Ex. 19).

On February 2, 2005, the same day that Mr. McDaniel signed the Agreement, Ms. Holt visited Mr. Lloyd in jail.   (Hr'g Tr. at 45, Feb. 22, 2008).   She read to him the January 14 letter Mr. Sanford had written.   (*Id.* at 46).   She noted that Mr. Lloyd had signed a Settlement Agreement giving up his claim for equitable relief, and he responded, "Well, I didn't mean to do that.   I just was trying to get the $36,000 for a lawyer."   (Hr'g Tr. at 83, Jan. 11, 2008; *see also* Hr'g Tr. at 46-47, Feb. 22, 2008).   Mr. Lloyd testified that he had always wanted to pursue equitable relief.   (Hr'g Tr. at 98, Jan. 11, 2008).   Mr. Lloyd wrote a note attempting to retract the Agreement and reflecting his intent to pursue equitable relief:

> I, Arthur Lloyd did sign an agreement with Atty David Sanford to accept 36,000.00 and not pursue my equitable relief.  However, I was under a great deal of stress and would like to withdraw the agreement.  I would prefer to pursue my motion for equitable relief from the Marshal [sic] Service.

(Pl.'s Ex. 17).  Later that day, February 2, 2005 at approximately 6:03 p.m., Ms. Holt faxed Mr.

Lloyd's note to Mr. Sanford.  (Pl.'s Ex. 17; Hr'g Tr. at 50-51, Feb. 22, 2008).

On February 3, 2005, after all the necessary government attorneys had reviewed,

approved, and signed the Agreement, Mr. McDaniel sent the Agreement to Mr. Sanford in an e-

mail attachment for his final review.  (Hr'g Tr. at 42-43, May 23, 2008; Def.'s Ex. 18).  The

e-mail, sent at 9:24 a.m. on February 3, offered Mr. Sanford and Mr. Lloyd one final opportunity

to object before the Agreement was filed with the Court: "I am prepared to file [the Agreement]

if you have no objection."  (Def.'s Ex. 18; Hr'g Tr. at 43, May 23, 2008).

Mr. Sanford wrote back at 10:56 a.m., saying: "Yes, please do.  Thank you for

your prompt attention.  [Mr. Lloyd] looks forward to putting this chapter behind him."  (Def.'s

Ex. 18).  Mr. Sanford testified that when he e-mailed Mr. McDaniel, he had not yet seen Mr.

Lloyd's statement, faxed to his office at 6:03 p.m. the previous day.  (Hr'g Tr. at 117, Mar. 20,

2008).  Mr. Sanford testified: "I never would have sent . . . that e-mail [to Mr. McDaniel] had I

received [Mr. Lloyd's letter] and read it myself before I had an opportunity to send an

e-mail . . . ." (*Id.* at 56).

Mr. Sanford testified that he did see Ms. Holt's fax sometime on February 3,

2005.  (Hr'g Tr. at 58, Mar. 20, 2008; Hr'g Tr. at 58, Feb. 22, 2008).  Mr. Sanford did not then

contact Mr. McDaniel to request that he wait to file the Agreement, however.  (Hr'g Tr. at 120-

21, Mar. 20, 2008).  Mr. McDaniel had not yet filed the Agreement when Mr. Sanford read the

fax.  (*See* Def.'s Ex. 19).[4]  Mr. Sanford testified that the reason he did not immediately contact

---

[4]        A review of the Court's electronic case filing system reveals that at that time, Mr.
Sanford did not receive e-mail notifications from the Court's electronic case filing system of
filings in this case.  Mr. Sanford therefore had no immediate way to know whether or when any

the government was because he wanted first to confirm whether the letter from Mr. Lloyd represented his true intent.  (Hr'g Tr. at 121, Mar. 20, 2008).

On February 3, 2005, Mr. Sanford called Ms. Holt, and left a voicemail asking that she contact him.  (Hr'g Tr. at 58, Feb. 22, 2008).  They spoke on February 4, 2005, and, according to Ms. Holt, Mr. Sanford informed her over the phone that the Agreement had been filed and that he had not told Mr. McDaniel that Mr. Lloyd desired to withdraw from the Agreement.  (*Id.* at 58-59).  Mr. McDaniel filed the Settlement Agreement at 11:15 a.m. on February 4, 2005.  (Def.'s Ex. 19).

On February 4, 2005, Ms. Holt called Mr. McDaniel after she learned from the Court's electronic case filing system that he had filed the Agreement.  (Hr'g Tr. at 53-54, Feb. 22, 2008).  She testified that she communicated to him her concern that Mr. Sanford may have had a conflict of interest in negotiating the Agreement because of his relationship with Stephanie Roemer, Mr. Lloyd's attorney in the criminal matter.  (*Id.*).

On February 5, 2005, Ms. Holt filed a motion requesting that the Court hold its approval of the Agreement in abeyance on the grounds that (1) Mr. Sanford had not notified the Court that Mr. Lloyd had attempted to retract the Agreement; and (2) Mr. Sanford may have had a conflict of interest in light of his relationship with Ms. Roemer.  (Dkt. 158; Dkt. 159 at 1).  The motion was granted on February 9.  (Minute Order, Feb. 9, 2005).

As of February 5, 2005, when Ms. Holt filed the motion, defendant was on notice that the Agreement might be withdrawn.  Nothing happened between February 4, when the

---

document, including the Stipulation of Settlement, was filed on the docket of the Court.  That is, Mr. Sanford did not know that Mr. McDaniel had not filed the agreement with the Court immediately after receiving Mr. Sanford's e-mail.

Agreement was filed, and February 5 to prejudice defendant's case.  (Hr'g Tr. at 45, May 23, 2008).[5]

On February 6, 2005, Mr. Sanford visited Mr. Lloyd in jail to discuss his February 2 note attempting to withdraw his acceptance of the Agreement.  (Hr'g Tr. at 62, Mar. 20, 2008).  Mr. Lloyd testified that Mr. Sanford "appeared upset to me, because the way he threw the papers down on the desk, and things, he wanted to know why I sent [the note]."  (Hr'g Tr. at 85, Jan. 11, 2008).  Mr. Lloyd testified that Mr. Sanford then told him to write another letter.  "[H]e didn't like the letter I had sent on February 2nd, so I was asked to write another letter."  (*Id.*).

In Mr. Sanford's presence, Mr. Lloyd wrote a two-page letter addressed to Mr. Sanford retracting his February 2 retraction of the Agreement.  (Pl.'s Ex. 18; Hr'g Tr. at 62, Mar. 20, 2008).  Mr. Lloyd testified that he wrote this letter at the request of Mr. Sanford.  (Hr'g Tr. at 86-87, Jan. 11, 2008).  He addressed his confusion regarding his entitlement to equitable relief at the time of his execution of the Agreement, and acknowledged that he had agreed to it because he needed the money to pay his legal expenses:

> I recently agreed, In January 2005 that you should take over my pending discrimination complaint against the Marshal [sic] Service because the Attorney Veronice Holt who was originally in the case when I got the jury verdict had promised me initially that

---

[5]    During direct examination, Mr. McDaniel alluded to "any number of witnesses who have grown old and retired" and argued that, should the Court allow the Agreement to be withdrawn, defendant would suffer prejudice thereby.  (Hr'g Tr. at 19, May 23, 2008).  Yet Mr. McDaniel, the lead attorney on the case, could not name any potential fact witnesses who are no longer available.  (*Id.* at 47).  Mr. Lazar testified that the fact witnesses the government might call would have been U.S. Marshals Service employees around the year 1994, and most of them had retired before the Agreement was signed.  (*Id.* at 63-64).  To the extent that live witnesses were a part of defendant's case and to the extent that defendant might be prejudiced by fading memories and the passage of time, the prejudice had begun before the Agreement was filed on February 4, 2005.  (*Id.* at 47-48).

my case would be done in two parts – the damages part or equitable relief would be done after the jury verdict, which I was awarded [sic] 36,000 dollars in 2001 because [sic] of the long delay I asked Attorney David Sanford to take the case over in 2005.

On January 14 [sic], 2005 Attorney David Sanford entered his appearance and arranged that I receive the 36,000 dollars and he agreed I would not pursue anymore complaints against the Marshal [sic] Service. Me [sic] and David Sanford had previously talked about getting this money released although I did not realize he had to make commitment that I drop all other complaints. On Saturday February 3, 2005, I received a visit from Attorney Veronice Holt who told me that the Judge was willing to give me equitable relief and if I still want equitable relief I should sign paper and record statement in the affirmative [sic] I said yes I have always wanted equitable relief and that's why I asked Attorney David Sanford to take the case for me. My understanding from Attorney David Sanford is that by accepting this money now and agreeing not to file other complaints against Marshal [sic] Service. Marshal [sic] Service will release jury award money to the Attorney David Sanford, and Stephany [sic] Romero [sic] who is co-counsel in my legal defense case. Attorney Veronice Holt alluded to some type of conflict in interest between David and Stephany [sic] but I told he [sic] that David told me they were married already. I would preferred [sic] that Attorney David Sanford handle this civil matter including the seeking of equitable relief but his position is that the pursuit of equitable relief would be held up by the Marshal [sic] Service for years and I need the money now for my legal Defense [sic]. . . .

I would like to resinn [sic] or cancel my recent agreement with Attorney Holt on continuing to seek equitable relief against the Marshal Service as I am now facing murder charging [sic] for defending myself, and Attorney David Sanfords [sic] agreement with the Marshal [sic] Service to accept the $36,000.00 jury award (January 14, 2005) is acceptable to me.

. . . [U]nder my present circumstances I and my family believe that Attorney David Sanford [sic] decision is the best For [sic] me in my present circumstances of facing criminal charges even though I feel these charges have been falsely attributed to me.

(Pl.'s Ex. 18).

20

On February 16, 2005, the defendant opposed Ms. Holt's motion to hold court approval of the Agreement in abeyance on the ground that Ms. Holt did not identify any basis for finding that the parties had not entered into a valid and enforceable contract.

On May 5, 2005, Mr. Sanford filed a motion requesting that this Court reconsider its Order holding the Agreement in abeyance on the grounds that (1) Mr. Lloyd had clearly indicated his desire to accept it; (2) Mr. Sanford had no conflict of interest in this matter; and (3) Ms. Holt had no standing to object. Mr. Sanford represented that he was "not married to Ms. Roemer, one of Mr. Lloyd's criminal defense attorneys" and that his firm "ha[d] never received, nor [would] it ever receive, fees in connection with the more than 400 hours of legal service it has thus far provided in both the civil and criminal matters." (*Id.* at 9). He acknowledged that "Ms. Roemer, who is Of Counsel to the firm, ha[d] received some money in connection with her legal services to date." (*Id.*).

On May 7, 2005, Mr. Lloyd wrote a letter to the Court to explain that he had wanted Ms. Holt to pursue his claims for equitable relief and had only agreed to settle those claims for the jury award amount in order to pay for his legal defense:

> I did ask Attorney David Sanford to represent me in this case in January 2005 when I realized there was this long 2 ½ to 3 year delay on completing this case . . . . Attorney Holt ask [sic] to finish the case because I expected to have the equitable relief portion of the case completed by the Court. However, when that was delayed I agreed with Attorney David Sanford that we needed to get the 36,000 dollar jury award to pay my legal expenses for the false charges that I have now been accused of by the State of Maryland. I did fire Attorney Holt in January 2005 [sic] she should not be speaking for me now. Only attorney David Sanford speak [sic] for me in this case. You should know that I did want the Court to hear my equitable relief claim because that was what this case was really about in the first place . . . .

(Pl.'s Ex. 19).

At the time Mr. Lloyd wrote this letter, his criminal trial was just days away and he needed money to pay for his legal expenses.  (Def.'s Ex. 30 at 1).  He had already paid approximately $35,000 towards his legal fees from refinancing his Florida home.  (Hr'g Tr. at 72, Jan. 11, 2008).  His relatives contributed $10,000 for his defense on May 5, 2005.  The family would contribute an additional $15,000 on June 3, 2005.  (Sanford Ex. 1; Hr'g Tr. at 124-126, Mar. 20, 2008).  Altogether, Mr. Lloyd paid $63,217 into an escrow account held at Mr. Sanford's firm.  (Hr'g Tr. at 144-45, Mar. 20, 2008; Sanford Ex. 1).  The $36,000 from this case would have brought the total nearly to the $100,000 Mr. Lloyd needed under the retainer agreement for his criminal defense.  (Pl.'s Ex. 11).

Mr. Lloyd's criminal trial in Montgomery County, Maryland began on May 23, 2005.  (Def.'s Ex. 30).  On June 3, 2005, while the trial was ongoing, Ms. Holt visited Mr. Lloyd in jail.  (Hr'g Tr. at 60, Feb. 22, 2008; Pl.'s Ex. 20).  At that time, she reviewed with him a detailed written statement she had prepared which set forth his options to either (1) proceed with the Settlement Agreement and waive his right to equitable relief in exchange for the jury award; or (2) withdraw from the Agreement and pursue his claims for equitable relief even though he would not receive any money in the immediate future.  (Pl.'s Ex. 20).  Mr. Lloyd initialed boxes indicating that he understood the consequences of both options and chose option 2, "to set aside the agreement to receive the $36,000 immediately and pursue my claim for equitable relief." (*Id.*).

On June 7, 2005, Ms. Holt moved to set aside the Settlement Agreement on the grounds that (1) Mr. Sanford had a conflict of interest and should not have negotiated the Agreement on Mr. Lloyd's behalf; (2) Mr. Sanford failed to communicate to the defendant and the Court Mr. Lloyd's attempt to retract the Agreement; and (3) Mr. Lloyd indicated in writing his desire to pursue his claim for equitable relief.

On June 20, 2005, Mr. Sanford filed a Reply to the Motion to Set Aside the Agreement in which he contended that (1) "Mr. Lloyd has never desired to waive his right to equitable relief" and it "remains a desired goal" (Dkt. 174 at 4, 5); (2) Mr. Sanford had no conflict of interest in negotiating the agreement because the firm had no "financial stake in this matter" since Mr. Sanford represented Mr. Lloyd "pro bono" in this matter *and* in his criminal matter (*Id.* at 5); and (3) Ms. Holt was terminated in November 2004 and did not speak for Mr. Lloyd in this matter (*Id.* at 6-7). Mr. Sanford acknowledged that Ms. Roemer was "Of Counsel to [his firm] and has been paid through other sources for her services in connection with Mr. Lloyd's criminal matter." (*Id.* at 5).

On June 9, 2005 Mr. Lloyd was convicted in Montgomery County of voluntary manslaughter and reckless endangerment. (Dkt. 180 at 3). On September 13, 2005, he was sentenced to 15 years in prison. (*Id.*). He is currently serving that sentence at the Maryland Correctional Institution in Hagerstown, Maryland.

On June 21, 2005, Mr. Lloyd sent a letter directly to the Court expressing his desire to have Ms. Holt represent him and stating that he "never intended not to pursue equitable relief in this case." (Pl.'s Ex. 21). He further wrote:

> I switched back to Attorney V. Holt when Attorney David Sanford
> made an agreement with the Marshal Service to accept the jury
> award of $36,000 dollars and I would agree to not pursue my
> equitable relief claim.  I signed this under pressure while lock up
> because Attorney David Sanford said I needed this money to pay
> the Attorneys representing my criminal case.  I told Attorney
> Sanford that I did not want this agreement and if he would drop
> this agreement he made with the Marshal Service against my
> wishes.

(*Id.*).

A few weeks later, on July 8, 2005, Mr. Sanford moved "to withdraw as attorney

of record for Plaintiff" on the ground that "plaintiff ha[d] recently expressed his desire to pursue

equitable relief with the assistance of his former attorney, Veronice Holt."  (Def.'s Ex. 23).

On November 1, 2005, Mr. Sanford filed a Notice of Attorneys' Charging Lien

asserting a lien in the amount of $30,000 "on the proceeds of any settlement or judgment Plaintiff

obtains in this action, including costs, expenses and attorneys' fees resulting from, or any way

attributable to such settlement or judgment."  (Pl.'s Ex. 22).  Mr. Sanford filed the motion on

behalf of his firm, Sanford, Wittels & Heisler, LLP, "for attorneys' fees and expenses associated

with Plaintiff's criminal defense in the matter of the <u>State of Maryland v. Arthur Lloyd</u>, Cr. No:

101417."  (*Id.*).  Mr. Sanford further asserted that the lien was brought on behalf of Barry

Helfand.  (*Id.*).

Because of the differing views of two attorneys who represented him in this

matter, the Court appointed pro bono counsel to assist Mr. Lloyd in the litigation of the motion to

set aside the settlement agreement.[6]

---

[6]     The Court would like to reiterate its gratitude and appreciation to Hamilton P.
Fox, III and Mariana T. Acevedo of Sutherland, Asbill & Brennan LLP for agreeing to the
Court's request to take on this matter pro bono and for their exceptional and very professional

To this day, defendant has not paid Mr. Lloyd the $36,000 judgment the jury awarded him and which it agreed to pay in the Agreement; nor does it intend to do so until there is a final resolution of the case.  (Hr'g Tr. at 38, May 23, 2008).

## II.  CONCLUSIONS OF LAW

Settlement agreements "are in the nature of contracts."  *Makins v. District of Columbia*, 277 F.3d 544, 546-47 (D.C. Cir. 2002); *see also American Security Vanlines, Inc. v. Gallagher*, 782 F.2d 1056, 1060 (D.C. Cir. 1986) ("An agreement to settle litigation is a contract and may not be unilaterally rescinded unless principles of contract law would authorize rescission.") (opinion of district court attached as appendix to per curiam opinion of court of appeals affirming; footnotes omitted).  Furthermore, under District of Columbia law, settlement agreements are "entitled to enforcement under general principles of contract law . . . .  [A] valid and binding agreement of compromise and settlement will be enforced as any other contract." *Goozh v. Capitol Souvenir Co.*, 462 A.2d 1140, 1142 (D.C. 1983).  "Few public polices are as well established as the principle that courts should favor voluntary settlements of litigation by the parties to a dispute."  *American Security Vanlines, Inc. v. Gallagher*, 782 F.2d at 1060 (opinion of district court attached as appendix to per curiam opinion of court of appeals affirming). Generally, "'[a]bsent a factual basis rendering it invalid, an . . . agreement to settle a Title VII claim is enforceable against a plaintiff who knowingly and voluntarily agreed to the terms of the settlement or authorized his attorney to settle the dispute.'"  *Wise v. Riley*, 106 F. Supp. 2d 35, 39 (D.D.C. 2000) (quoting and citing *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209

---

efforts in representing Mr. Lloyd.

(5th Cir.1981)).  While settlement agreements, "deliberately entered into by parties for final disposition of their controversy," generally bind the parties and "ought not to be lightly set aside," *Maiatico v. Novick*, 108 A.2d 540, 541 (D.C. 1954), a court may set aside such agreements "wherever justice requires."  *Id.*

Despite Mr. Lloyd's current counsel's arguments to the contrary, there was an intent to form a contract in this case.  The record is clear that Mr. Lloyd repeatedly changed his mind about his willingness to agree to withdraw his motion for equitable relief in exchange for the government's waiver of appeal and immediate payment of the jury verdict sum of $36,000. While he changed his mind numerous times, however, Mr. Lloyd's signature on the Agreement demonstrates that at the moment he signed it, he agreed to its terms.  When Mr. McDaniel signed it three days later, he expressed his client's intent to do the same.[7]  "'A plaintiff who consents to a settlement on the advice of counsel or whose attorney actively negotiates settlement on the plaintiff's behalf is presumed to have knowingly and voluntarily consented to settlement on the agreed terms absent fraud or duress.'"  *Wise v. Riley*, 106 F. Supp. 2d at 39 (quoting and citing *Pierce v. Atchison*, 65 F.3d 562, 571 n. 1 (7th Cir.1995)); *see also American Security Vanlines, Inc. v. Gallagher*, 782 F.2d at 1060 ("An agreement to settle litigation is a contract and may not be unilaterally rescinded unless principles of contract law would authorize rescission.") (opinion of district court attached as appendix to per curiam opinion of court of appeals affirming; footnotes omitted).

---

[7]      Whether there was in fact a "meeting of the minds" is an interesting metaphysical question, since plaintiff may have changed his mind after he signed the Agreement but before Mr. McDaniel did so.  But after Mr. McDaniel signed, there certainly existed a written agreement signed by both parties.

The Court concludes that once Mr. McDaniel signed the Agreement, there was a contract. And even Mr. Lloyd's counsel concedes that Mr. Lloyd cannot meet the elements required to demonstrate coercion or duress in order to void the contract. There is a separate question, however, of whether the contract is effective or enforceable. The terms of the Settlement Agreement itself provide that it is "effective upon approval of the Court[.]" (Pl.'s Ex. 16 ¶ 9). The contract also provides that defendant need not initiate the processing of payment of the $36,000 to Mr. Lloyd until the Court approves the Settlement Agreement. (*Id.* ¶ 4). The contract terms basically provide, in short, that Court approval is a condition precedent – to the contract being effective, *and* to the defendant's obligation to perform under the contract by paying Mr. Lloyd. *See Transcontinental Gas Pipe Line Corp. v. Federal Energy Regulatory Comm'n*, 659 F.2d 1228, 1233 n.45 (D.C. Cir. 1981) ("Approval by a third party is certainly a condition precedent."); *Psaromatis v. English Holdings I, L.L.C.*, 944 A.2d 472, 482 (D.C. 2008) (a condition precedent is an event which must occur before performance under a contract becomes due). "[W]hen the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intention of the parties." *Mesa Air Group, Inc. v. Dep't of Transp.*, 87 F.3d 498, 503 (D.C. Cir. 1996).

The Court declines to approve the Settlement Agreement, in an exercise of its discretion based upon the unusual factual circumstances of this case. As a result, the Settlement Agreement is not effective or enforceable. There are a number of factors leading the Court to exercise its discretion and decline to approve the Settlement Agreement. First, Mr. Lloyd, while perhaps not coerced or under duress in the contract law sense of those terms, was certainly under a great deal of stress. And, while under that stress, he was receiving conflicting advice regarding

the Settlement Agreement from two persons – his attorneys – whom he trusted.[8]  Next, Mr. Lloyd

attempted to repudiate the Agreement before it was filed with the Court, and, significantly,

before Mr. McDaniel asked for final permission from Mr. Lloyd's counsel to file the Stipulation

of Settlement with the Court.  At the time Mr. Sanford authorized Mr. McDaniel to file the

Agreement with the Court, it no longer comported with the expressed written intent of Mr.

Lloyd.  To repeat: *Before* Mr. McDaniel asked Mr. Sanford whether plaintiff consented to having

the Stipulation of Settlement filed with the Court, Mr. Lloyd had communicated his repudiation

of the Agreement to his lawyer, Mr. Sanford.  It is not Mr. Lloyd's fault that the note he wrote

and which was faxed on his behalf to Mr. Sanford by Ms. Holt was not routed through Mr.

Sanford's law firm office to Mr. Sanford before Mr. Sanford responded to Mr. McDaniel's e-

mail.

Finally, and perhaps most importantly, *Mr. Lloyd never received the benefit of his

bargain* – to be paid $36,000, the amount of his jury award, *immediately*, in order to be able to

pursue his criminal defense as he chose.  The fact that the government never paid Mr. Lloyd the

$36,000 is the strongest and most persuasive evidence that in the parties' view, the Settlement

Agreement means what it says – that is, that the Court's approval was a condition precedent and

that the contract is not effective and was never intended to be effective until the undersigned

approves it.[9]  And, in the interests of justice, this Court declines to do so.  As a result of the

---

[8]      The Court declines to discuss, characterize, or decide anything on the basis of or
with respect to any of the various allegations of attorney misconduct that have been aired here,
against the attorneys involved in this case.

[9]      Further evidence that the government does not think that the Stipulation of
Settlement is effective until approved by the Court is found in the fact that the government has
never negotiated with Ms. Holt or paid attorneys' fees arising from the trial in this case, as

Court's refusal to approve the Settlement Agreement, under its own plain language the

Agreement is not, and will not become, "effective."  (Pl.'s Ex. 16 ¶ 9).

       An appropriate Order accompanying this Opinion will be issued this same day.

       SO ORDERED.


                             _____/s/_____
                             PAUL L. FRIEDMAN
                             United States District Judge

DATE:  July 31, 2008

---

contemplated by the Settlement Agreement.  (Pl.'s Ex. 16 ¶¶ 2, 3, 5, 7, 8, 9, 10).  Specifically, the Agreement provides that "Defendant will separately seek to resolve with Veronice Holt, Esquire – trial counsel in this matter – what attorneys' fees she is legally entitled to receive or to litigate her fee claim, once filed, before the Court."  (*Id.* ¶ 3).

       This conclusion is also consistent with the fact that Mr. McDaniel felt the need to confer with Mr. Lloyd's counsel to seek final approval before filing the signed Agreement with the Court.  That suggests that the government thought that there was an effect of *filing* the agreement, rather than just the signing of it.